James Coster (JC-1431)
Joshua M. Rubins (JR-8338)
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, New York 10169-0079
Tel: (212) 818-9200
Fax: (212) 818-9606
Attorneys for Plaintiff JPMorgan Chase Bank, N.A.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JPMORGAN CHASE BANK, N.A.,     :

     Plaintiff,     :

  -against-        :

ACTUATE CORPORATION,     :

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

07 Civ. 444 (JFK; AJP)
ECF CASE

**COMPLAINT**

     Plaintiff JPMorgan Chase Bank, N.A. ("JPMC"), by its attorneys, Satterlee Stephens Burke & Burke LLP, as and for its Complaint against defendant Actuate Corporation ("Actuate"), alleges as follows:

**THE PARTIES**

     1. JPMC is a national banking association organized and incorporated under the laws of the United States with its main office at 1111 Polaris Parkway, Columbus, Ohio 43240, and offices in New York at 270 Park Avenue, New York, New York 10017.

     2. Defendant Actuate is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 701 Gateway Blvd, South San Francisco, California 94080.

677555_4

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over plaintiff's breach of contract and declaratory judgment action under 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000 exclusive of interest and costs and the dispute is between citizens of different states.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to the claim occurred in this judicial district. In addition, defendant Actuate is subject to personal jurisdiction in this district and is therefore deemed to reside in this district for venue purposes.

## NATURE OF THE DISPUTE

5.     In this action, plaintiff JPMC seeks emergency injunctive relief in order to prevent Actuate from wrongfully terminating certain critical software licenses and software support services. Specifically, Actuate has embarked on a series of extortionate acts, including, but not limited to, wrongfully demanding on one or more occasions that JPMC pay Actuate approximately $12,000,000 in license fees, which are not in fact owed by JPMC.

6.     Actuate has compounded its wholly unjustified demands by unlawfully threatening to terminate support services worldwide, which would effectively deprive JPMC of the use of the essential software for which it has previously paid Actuate many millions of dollars in license fees and maintenance charges. Indeed, in the event of a problem with the Actuate software that requires maintenance and support (a circumstance that, has, in the past, arisen periodically without warning, and could occur again at any time), Actuate's refusal to provide the essential assistance (that only Actuate is capable of providing) would have cause devastating and irreparable harm to JPMC, its customers, and its business partners. For example, if JPMC were deprived of the use of the Actuate software:

* Thousands of individual banking customers would not be able receive their monthly bank statements, annual tax statements, or obtain vital information concerning the activity and status of their accounts;

* JPMC would be not be able to carry out many of its government reporting obligations, as it is required to do by federal, state, and foreign laws and regulations;

* JPMC would be unable to service certain of its institutional business partners;

* The markets in certain specialized securities (in which JPMC hold a large share) would be adversely affected; and

* Some units of the company would effectively be entirely unable to conduct business.

7.     As a pretext for making these unlawful and inappropriate demands for license fees to which it is not entitled, Actuate has falsely accused JPMC of a series of purported violations of the terms of the Software Licenses (described more fully below), which have not in fact occurred (the "Disputes").   By threatening to terminate its software license and maintenance and support obligations worldwide based upon these pretextual Disputes, and refusing to provide JPMC with assurances that it would continue to perform its contractual obligations, Actuate has willfully and intentionally breached its license agreements with JPMC, which require Actuate to continue its performance pending the resolution of any dispute or controversy.

8.     To avoid this entirely unwarranted and potentially crippling disruption of JPMC's business that Actuate is threatening to cause, JPMC respectfully requests emergency injunctive relief from this Court requiring Actuate to maintain the status quo and to continue providing essential support services to JPMC and requiring the software license to remain in place until the disputes between the parties can be decided by this Court or otherwise resolved.

9.    JPMC also seeks declaratory relief, declaring that JPMC does not owe Actuate the amounts demanded, and that there is no basis for Actuate to terminate the software license agreements, which remain in full force.

## THE FACTS

### A. ACTUATE'S SOFTWARE

10.    Actuate has licensed to JPMC certain enterprise reporting software that provides highly sophisticated reporting functions (the "Actuate Software"). While JPMC has licensed a number of different software programs from Actuate, most, if not all, are used to gather data and information from other databases and software programs, which are, in turn, used to generate reports that are used continuously by many different lines of JPMC's business.

11.    More specifically, Actuate provides software and services for enterprise reporting and performance management applications. The Actuate Software provides a platform which can be integrated with other software applications that JPMC has developed or has licensed from other vendors. Such applications retrieve business information from JPMC's databases and deliver it by means of the Actuate Software in interactive Intranet pages, Excel spreadsheets, and printed reports, among other media. The Actuate Software allows JPMC to gather content from a wide range of data sources and present it in virtually any format required by JPMC's users.

12.    Actuate also provides maintenance support for its software, which is essential to keep the software operational in the event that a technical problem occurs.

13.    The efficient collection and exchange of information is a vital component of the banking business. Because the Actuate Software is the sole means by which certain lines of JPMC's business can collect, organize, transmit, and display certain essential information, the

4

Actuate Software is indispensable to those lines of business. If the Actuate Software were to become inoperable because of Actuate's refusal to perform crucial maintenance and support, the information that JPMC needs to conduct the affected lines of its business would still reside on JPMC's computers, but there would be no way for JPMC to access and use that information.

14. The Actuate Software was just one of several software suites that JPMC could have selected to satisfactorily perform the functions and operations that the Actuate Software is used to perform. The Actuate Software is by no means unique. Indeed, JPMC licenses similar software from other vendors for use by some of JPMC's lines of business.

15. While, as stated above, several other vendors offer reporting software that provides equivalent capabilities and features, now that the Actuate Software is integrated with other JPMC software programs and databases in many lines of business, the competing software products cannot be substituted for the Actuate Software without many months of planning, specialized programming, and tremendous expense. In other words, the lines of JPMC's business that use Actuate Sofware effectively have no ability to replace the Actuate Software in the event that Actuate were to make good on its threats by discontinuing maintenance and support, and putting certain portions of JPMC's business at dire risk.

## B. THE SOFTWARE LICENSES AT ISSUE

16. The licensing and maintenance obligations that Actuate owes to JPMC arise out of two agreements, entered into prior to the 2000 merger of J.P. Morgan & Co. ("Morgan") and The Chase Manhattan Corporation, which was the parent of Chase Manhattan Bank ("Chase"): (1) the "End User Software License Agreement" between Actuate and Chase, dated June 30, 1997 and as amended effective the same date (the "1997 Agreement"); and (2) the "Software System License Agreement" between Actuate and Morgan, dated September 30, 1999

5

(the "1999 Agreement"). Both agreements (collectively referred to herein as the "License Agreements") create obligations on the part of Actuate that survived the 2000 Chase/Morgan merger and now extend to all of the post-merger Morgan affiliates, including JPMC.

## The 1999 Agreement

17.    Section 2(a) of the 1999 Agreement grants Morgan (its successors, and affiliates) an <u>irrevocable</u> license to use the Actuate software:

> Licensor hereby grants to Morgan, subject to the terms and conditions set forth in this Agreement, an unconditional and irrevocable non-exclusive license (the "License") to use a proprietary programmed software system in the quantities set forth herein and/or in any Purchase Orders issued by Morgan, and consisting of the various features, programs and modules set forth in Exhibit A attached hereto and made a part hereof, as well as any Documentation (collectively, the "System") at any geographic location of Morgan.

18.    In addition to the license, Section 9 of the 1999 Agreement requires Actuate to provide maintenance and support for the Actuate Software:

> Licensor agrees to provide to Morgan in accordance with Exhibit D any major or minor release, upgrade, enhancement, improvement or modification to the system by Licensor, including annual updates, editorial format or other changes ("System Modifications"), as well as maintenance and support services . . . for the most current version of the System and all System Modifications released to Morgan for which Licensor is required to provide support in accordance with Exhibit D (collectively, "Maintenance"). Such System Modifications and Maintenance shall be provided to Morgan subject to Morgan subscribing to Maintenance upon completion of the Acceptance Period and paying to Licensor the Maintenance fee in Exhibit B.

19.    Actuate's maintenance obligation is confirmed in Section 4 of Exhibit B to the 1999 Agreement, which states that "[d]uring the term of this Agreement, Actuate will provide Morgan maintenance and support services" and sets forth the applicable maintenance fee, and in Section 7(a) of Exhibit D to the 1999 Agreement, which states that (provided Morgan

6

pays the maintenance fee) Actuate shall "automatically provide Maintenance to Morgan" for 12 month terms that, at Morgan's option, "automatically renew[]."

20. Section 5(a) of the 1999 Agreement states that the term is "perpetual." Further, while Morgan has the right to terminate the agreement by giving 30 days' written notice, Actuate has no express right of termination (Id.) This arrangement is echoed in the maintenance provisions in Section 7(a) of Exhibit D to the 1999 Agreement, which confirm Actuate's obligation to provide maintenance under 12-month renewable terms that are "automatically renewed . . . unless terminated by Morgan upon providing Licensor with not less than 30 days' prior written notice."

21. Other provisions of the 1999 Agreement that bear on the dispute between the parties include the following:

- Section 2(a) provides that "[i]f, after the Effective Date hereof, any Affiliate of Morgan ceases to qualify as an Affiliate for any reason, Licensor hereby further grants to such Affiliate, at no additional cost or expense, all of such rights specified in [the License] for a grace period of 12 months to enable such Affiliate to continue exercising such rights during any transition to any alternative information processing capabilities."

- Section 11(b) provides that "Morgan may duplicate items that comprise the System and Documentation, *provided* that the number of copies made do not cause Morgan to exceed the number of copies for which it is licensed, for the purpose of (i) using the System on any computer system at any geographic location, (ii) developing a Morgan improvement, or (iii) without payment of an additional license fee, archive or emergency restart use." (Emphasis added).

- Section 13(d) sets forth a covenant by Actuate that, "to the extent any unauthorized copying of the System or Documentation arises as a direct result of Morgan's breach of this Agreement, Licensor agrees not initiate litigation, arbitration, or any other legal dispute resolution process against Morgan, *provided* that Morgan agrees to promptly

7

> pay to Licensor the actual cost for each unauthorized copy
> of the System and Documentation computed in accordance
> with Licensor's then current Morgan price."

22.     Finally, the 1999 Agreement contains provisions governing how the parties must conduct themselves if any disputes arose. Most important among these provisions is Section 15(i) requiring that "[p]ending resolution of any dispute or controversy both parties shall continue their performance under the Agreement . . . ." Section 15(i) as provides that JPMC "<u>may</u> make any payments under protest, reserving any rights it may have to seek reimbursement from [Actuate]. (Emphasis added.) JPMC has repeatedly offered to pay all amounts that it is obligated to pay, and JPMC is not obligated, under § 15(i) (which is, by its express terms, permissive, not mandatory), to "perform" by complying with Actuate's extortionate demands, which are so outrageous (and so clearly designed to take unfair advantage of JPMC's reliance upon Actuate's software) that they violate Actuate's duty of good faith and fair dealing.

23.     Section 15(j) of the 1999 Agreement also provides both parties' consent to the entry of orders of temporary or permanent injunctive relief and specific performance, and the agreement that in the event of any breach or threatened breach, the non-breaching party will have no adequate remedy at law.

### The 1997 Agreement

24.     Section 2.02 of the 1997 Agreement provides that the license is deemed to be for "the useful life of the Software unless sooner terminated." Under Section 12.01 of the 1997 Agreement, as amended, Actuate may only terminate for certain specified breaches, and then only provided that Chase does not cure the breach within 30 days of written notification by Actuate. (The 1997 Agreement between Actuate and Chase, dated June 30, 1997, was also

8

amended on its effective date (the amendments are attached at the end of the primary agreement), but the amendment does not limit the term.

25.     Like the 1999 Agreement, Section 14 of the 1997 Agreement provides for transitional use of the software in the event of a divestiture of a portion of Chase's business:

> Should Company divest a part of its business, the divested part shall have the right without additional cost to utilize the Software and/or Company shall have the right to use the Software, without additional cost, except for Maintenance and Support fees, if applicable, to support the divested business for a period of twelve (12) months from divestiture without charge, provided that Company agrees to ensure that the divested business agrees to be bound by the restrictions on use and disclosure of the Product as set forth herein.

## C. ACTUATE'S WRONGFUL NOTICE OF BREACH

26.     JPMC has duly performed all of its duties under both the 1999 Agreement and the 1997 Agreement. Nevertheless, in an effort to extract money from JPMC that JPMC does not in fact owe, Actuate falsely asserted in a series of emails, letters, and telephone communications in November and December 2006 that JPMC has materially breached the terms of both license agreements.

27.     For example, in December 2006, Actuate contacted JPMC and threatened to seek $12 million in additional license fees – a demand that, as shall be shown, has no basis – if JPMC did not assist Actuate by pressuring Bank of New York ("BNY") to buy an Actuate license by the end of 2006 (which BNY ultimately did, though not as a result of any JPMC urging). As a further example, when JPMC and Actuate discussed the use of Actuate software on six production CPUs used by JPMC's International Private Bank, Actuate wrongfully demanded a payment that was $800,000 in excess of the actual license fees and maintenance charges for JPMC's use.

9

28.     When JPMC did not accede to Actuate's extortionate demands, Actuate dispatched a letter dated December 28, 2006 (the "December 28 Notice") in which it purported to identify a series of "infringement matters." (A copy of the December 28 Notice is annexed hereto as Exhibit "A.") In each and every one of the enumerated "infringement matters," JPMC has, in fact, fully performed its duties under the terms of the 1999 and 1997 Agreements. Nevertheless, Actuate unlawfully threatened to terminate the licenses and all maintenance and support of the Actuate Software for all of the Actuate Software used worldwide throughout the entire company unless JPMC "cures" the non-existent breaches.

29.     By asserting in the December 28 Notice that it would terminate the 1997 Agreement and the 1999 Agreement and discontinue maintenance and support of the software -- when, in fact, it has no lawful basis whatsoever for doing so -- Actuate has anticipatorily breached both license agreements.

30.     In light of Actuate's anticipatory breach, JPMC delivered to Actuate on January 15, 2007, a letter demanding assurances (the "Demand for Assurances") by the close of business on January 17, 2007, that Actuate would not, in fact, terminate the license agreements or the maintenance and support services it is required to provide to Actuate. (A copy of JPMC's Demand for Assurances is annexed hereto as Exhibit B.) The Demand for Assurances also warned Actuate that if it carried out its improper threats, Actuate would cause irreparable injury to several important lines of JPMC's business and gravely injure the financial and other interests of JPMC's customers and business partners.

31.     Actuate failed to provide a written response within the requested period. Instead, Actuate has allowed its improper December 28 Notice to remain in effect. And it was only when Actuate learned that litigation was imminent that Actuate indicated that it would

10

consider extending the threatened January 27, 2007, worldwide cut-off date for the software licenses and vital maintenance and support to February 28, 2007. Moreover, Actuate made clear that it would not withdraw its groundless notice of breach.

32. In light of Actuate's failure to provide the requested assurances that it would not terminate the licenses and discontinue maintenance and support services, Actuate has materially breached both the 1999 Agreement and the 1997 Agreement.

33. Accordingly, JPMC was left with no alternative but to seek the assistance of the Court in preventing Actuate from causing devastating harm to JPMC's business and to JPMC's customers and business partners.

34. JPMC also seeks a declaratory judgment that it has no liability to Actuate and that it is not in violation of any of its contractual duties relating to any of the "infringement matters" identified by Actuate in the December 28 Notice, including, as set forth below, the matters that the parties have referred to as: (a) the Geneva Dispute; and (b) the Investment Banking Dispute; (c) the BNY Dispute; as well as (d) the various vague and nonspecific charges that Actuate has made concerning alleged reporting responsibilities and procedures for tracking the use of the Actuate Software.

## D. ACTUATE, IN BAD FAITH, PRECIPITATES THE GENEVA DISPUTE

35. As an ostensible basis for its threat to terminate JPMC's rights under the Software License, Actuate has claimed a "material breach" and an "infringement" based on certain uses by of the Actuate Software by JPMC's International Private Bank (the "International Private Bank") with computing operations based in Geneva, Switzerland (the "Geneva Dispute").

36.     The Actuate Software is essential for the performance of a series of essential services to the individual customers of the International Private Bank, including, but not limited to: preparing customers' monthly account statements; preparing customers' year-end tax statements; tracking historical performance, asset allocation, benchmark comparison, performance attribution, risk ratio for customer accounts; and monitoring collateral for customer borrowing. The International Private Bank also uses the Actuate Software for some governmentally mandated regulatory reporting and for a variety of internal purposes relating to managing of computing operations.

37.     If Actuate were to make good on its unlawful threat to cut off JPMC's licenses and vital maintenance and support services, the International Private Bank could literally find itself unable to service the accounts of its individual customers in several countries throughout the world.

38.     In precipitating the Geneva Dispute, Actuate has invented an entirely pretextual claim for over a million dollars in an effort to extract payments from JPMC that JPMC does not in fact owe.

39.     In Geneva, the Actuate Software is installed on six central processing units ("CPUs") used for production purposes, six CPUs used for development and testing purposes, and six CPUs used for "emergency restart" purposes. ("Emergency restart" refers to a procedure to get software up and running as soon as possible if and when there is an event, of any kind, that causes the software on the regular production CPUs to become inoperable.)

40.     It is undisputed that all license fees for the Actuate Software running on the six production CPUs have been paid in full.

41.     In 2006, JPMC in conjunction with Actuate determined that JPMC also needed licenses to run Actuate Software on six development and testing CPUs for the period from 2002 through 2006.

42.     Section 13(d) of the 1999 Agreement specifically provides that, if at any time JPMC is operating without all needed Actuate licenses, it can pay Actuate the actual cost for each additional copy "computed in accordance with [Actuate's] then current Morgan price." In the meantime, Actuate is contractually obligated "not [to] initiate litigation, arbitration, or any other dispute resolution process against [JPMC]."

43.     JPMC has, at all times, indicated its willingness to pay the applicable license fees and back maintenance, at the contract price.

44.     However, in an effort to extract additional sums from JPMC, Actuate falsely contended that JPMC owed Actuate for twelve additional licenses instead of six. Actuate also put forward an incorrect computation of the fees owed for the Actuate Software used on the six development and testing CPUs.

45.     As its ostensible basis for demanding payment for software licenses for twelve CPUs instead of six, Actuate improperly contended that it was entitled to payment for software that was installed, but not operational, on six CPUs that JPMC has outfitted for "emergency restart purposes." Such software will only be used operationally in the event that there is an event that causes the Actuate Software running on JPMC's six production CPUs (which have at all times been fully licensed) to cease functioning. Only then would JPMC use the six emergency CPUs in production until the emergency situation can be remedied. At no time would the Actuate Software actually be run in production on more than the 6 CPUs licensed.

13

46.     Section 11(b) of the 1999 Agreement expressly states that JPMC "may duplicate items that comprise the System" (which is defined in the agreement to include the Actuate Software) "for the purpose of . . . without payment of an additional license fee, archive or emergency restart use." Accordingly, it is beyond reasonable dispute that JPMC had no obligation to pay a license fee (or maintenance and support fees) for the copies of the Actuate Software installed on six CPUs of the International Private Bank for "emergency restart purposes."

47.     By (a) wrongfully insisting on additional license and maintenance fees from JPMC for Actuate Software installed on six CPUs only for "emergency restart purposes," (b) by miscalculating the license and maintenance fees for the Actuate Software used on the six development and testing CPUs, and by (c) by declining to apply against the fees $220,730 in credits that JPMC has accrued, Actuate inflated its payment demand relating to the Geneva Dispute by more than $800,000 above and beyond the actual fees that are owed.

48.     In its Demand for Assurances dated January 15, 2007, JPMC once again tendered the full amount owed for the license fees and maintenance attributable to the six development and testing CPUs.  As of January 18, 2007, Actuate has not accepted the amount tendered by JPMC, and instead continues to demand an amount totaling approximately four times the correct fees and charges.

49.     JPMC has tendered all required license fees and all required maintenance and support payments relating to the use of Actuate Software in International Private Bank. Actuate has, however, declined to accept JPMC's tender of payment and continues to cite the Geneva Dispute as a pretext for terminating the software licenses and discontinuing maintenance and support.  Actuate's conduct in the Geneva dispute therefore breaches its obligations under

14

the Software Licenses and imminently threatens tremendous harm to JPMC and to thousands of

individual customers of the International Private Bank for which JPMC has no adequate remedy

at law.

## E. ACTUATE, IN BAD FAITH, PRECIPITATES
## THE INVESTMENT BANKING DISPUTE

50.     As a second ostensible basis for its threat to terminate JPMC's rights

under the Software License, Actuate has claimed a "material breach" and an "infringement"

based on certain uses of the Actuate Software by JPMC's Investment Banking, Proprietary

Positioning Group (the "Investment Banking Dispute").

51.     The Investment Banking Dispute is nothing more than a simple

miscommunication between the Proprietary Positioning Group and Actuate.

52.     Pursuant to a letter agreement with Actuate dated June 15, 2004 (the

"2004 Letter Agreement"), the Private Positioning Group received permission to expand its use

of Actuate Software to four production CPUs.  The Private Positioning Business also has the

right, under its licenses, to use the Actuate Software on four development and testing CPUs and

to have the software installed on four additional CPUs for emergency restart purposes only.  The

Private Positioning Business has never exceeded that usage.

53.     Actuate has asserted in the December 28 Notice that the Proprietary

Positioning Group is using "a 'cancelled' 10 CPU license key (mbaK4-c3vdy-kdKWd-qrbd)" on

"an 8 CPU server."  Actuate thereby implies that JPMC has exceeded the authorized use of the

Actuate Software.

54.     But, in fact, at all relevant times, the Private Positioning Group has had in

hand a valid, current twelve CPU license key, issued by Actuate, that is sufficient to cover all of

the uses it has made of the Actuate Software.  Apparently, Actuate believes that it cancelled the

10 CPU license key when it issued this newer 12 CPU license key. The inadvertent use of what Actuate describes as an expired 10 CPU license key on one server belonging to the Private Position Group is of no practical or financial consequence whatsoever and does not deprive Actuate of any license fees or maintenance and support payments.

55. JPMC has had, at all times, the licenses it needs from Actuate for the operations that the Proprietary Positioning Business is running, and has made all required payments for the maintenance and support of the Actuate Software. Indeed, the scope and configuration of the use of the Actuate Software by the Private Positioning Business has remained essentially unchanged since 2004.

56. The Investment Banking Dispute in Actuate's December 28 Notice appears to have been designed only to make it appear that there are a multiplicity of disputes between the parties in an effort to support Actuate's insupportable demands for more money from JPMC.

57. The Proprietary Positioning Business uses the Actuate Software for a number of essential reporting and business analysis purposes. The software gathers data and information from other software products and databases and organizes them into reports, spreadsheets, and output files on matters such as the business's profit and loss, risk positions, trading activity, and financial activities. The reports prepared using the Actuate Software are virtually indispensable to the day-to-day operations of the Proprietary Positioning Business. The individuals who use Actuate have no alternative method to collect the data and prepare the reports they need to do their jobs.

58. More specifically, the Private Positioning Group uses Actuate Software to verify and support its financial statements. If the software were unavailable, the Group would be

unable to meet certain of its regulatory reporting obligations, including, but not limited to, those imposed by the Sarbanes-Oxley Act, and its ability to maintain day-to-day control over our operations would be drastically compromised.

59.     As another example of the harm that Actuate is threatening to cause, traders in the Private Positioning Group, who regularly take positions where millions of dollars are at risk, use reports generated with the Actuate Software to aid in their trading decisions and to verify that their trades have been booked correctly.  The Actuate Software is also used to monitor changes in the level of risk associated with existing holdings.  Without the benefit of this indispensable tool, the operations of the Private Positioning Group would be put in a highly precarious situation.

60.     JPMC has paid all required license fees and made all required maintenance and support payments relating to the use of Actuate Software in the Investment Banking, Private Positioning Group. Actuate's conduct in the Investment Banking Dispute therefore breaches its obligations under the Software Licenses and imminently threatens tremendous harm to JPMC for which JPMC has no adequate remedy at law.

## F. ACTUATE, IN BAD FAITH, PRECIPITATES THE BANK OF NEW YORK DISPUTE

61.     As a third ostensible basis for its threat to terminate JPMC's rights under at least two master license agreements, Actuate has claimed a "material breach" and an "infringement" based on JPMC's sharing of "server images" of the Actuate Software with the BNY in connection with the BNY's acquisition of JPMC's corporate trust business in 2006 (the "BNY Dispute").   In fact, this sharing of images was undertaken only after Actuate's consent was obtained.  Actuate did not raise a word of objection to the sharing of the images with BNY

17

until months later, when it was engaged in a dispute with JPMC over an unrelated licensing-fee matter and evidently sought additional "leverage" in its efforts to extract exorbitant payments from JPMC.

62.     By way of background, in April 2006, JPMC and BNY entered into an agreement whereby BNY would acquire JPMC's corporate trust business. In order to carry out the complex computer conversion involved in this transaction, BNY needed to receive images of all the vendor-software installed on server computers used by JPMC in the corporate trust business. JPMC agreed with BNY to provide these images for use solely in connection with the corporate trust conversion and not for production purposes.

63.     To ensure that the numerous software vendors involved in the transfer of the corporate trust business (Actuate was only one of about one hundred) knew of, and consented to, this sharing of images, JPMC contacted each vendor, described the use at issue, requested consent, and confirmed the consent by e-mail.

64.     Specifically, in early August 2006, a JPMC vice president, Natalie Ruiz, sent to Dan Gaudreau, Actuate's CFO, an e-mail request for consent to share server images of certain Actuate Software with BNY. The request was referred to Actuate's legal counsel, Dan Earls. Mr. Earls and Ms. Ruiz subsequently discussed the consent by telephone and e-mail, and Mr. Earls gave his consent to the request.

65.     On August 10, 2006, Ms. Ruiz sent Mr. Earls an email confirming Actuate's consent, which said:

> As a follow-up to our conversation, I want to thank you for Actuate's consent to JPMorgan Chase to share images of the JPMorgan Chase servers used primarily for JPMC's Corporate Trust Business which contain copies of Actuate's software, with the Bank of New York to assist the Bank of New York with its

planning and implementing the necessary corporate trust computer systems conversions. Your cooperation is greatly appreciated.

(A copy of this e-mail is attached hereto as Exhibit C.)

66.     No one at Actuate ever questioned the existence or validity of Actuate's consent until approximately three and one-half months later, in November 2006, when Actuate first disputed the effectiveness of the consent and as part of a concerted and coordinated effort to unlawfully extract staggering additional payments from JPMC that JPMC did not owe. Indeed, in December 2006, an Actuate officer preposterously stated that the newfound dispute over the effectiveness of the consent "looks like it's about a 12 million dollar issue," when in fact JPMC has no liability whatsoever to Actuate. The Actuate officer then went on improperly to suggest that it might "overlook" this issue if JPMC pressured BNY to purchase its own licenses from Actuate by year-end in 2006 rather than in mid-2007:

> You know there are ways to work around this I think, but I'm gonna need your help to do that. We all know that Bank of New York needs to buy something at some point. I think they'd prefer to wait till next September; we want them to buy it now. If you help us get them to buy the software now, we might be able to overlook this transgression, but if we don't get help from you, and in fact if you push back the other way, it's going to be a totally different issue. I mean 12 million dollars is certainly worth going after. . . .

(A transcript of the improper *quid pro quo* proposed by the Actuate officer is annexed hereto as Exhibit D.)

67.     The request to Actuate for its consent to share server images with BNY was handled in the same manner as the requests to JPMC's many other software vendors in connection with the transfer of the corporate trust business to BNY. Upon information and

19

belief, none of the other vendors who provided consent pursuant to discussions and a confirming e-mail from JPMC has in any way questioned the effectiveness or propriety of the consent.

68.     By threatening on the basis of the BNY Dispute to terminate – company-wide -- the Software Licenses with JPMC and to discontinue vital maintenance and support, Actuate anticipatorily breached the terms of its software licenses to JPMC. It further breached its license agreements with JPMC by persisting in its wrongful threat to terminate even after JPMC sent its Demand for Assurances that Actuate would abide by the terms of those agreements.

69.     When Actuate threatened to terminate the software licenses and to withdraw maintenance and support, it knew or should have known that such actions would cause devastating harm not only to JPMC, but also to BNY, as JPMC is, pursuant to an agreement with BNY, continuing to provide services to BNY that use and depend upon the Actuate Software during the transition of the corporate trust business to BNY.

70.     Actuate's wrongful threat to terminate the Software Licenses, as well as maintenance and support, was all the more outrageous given the fact that, upon information and belief, BNY did in fact enter into a direct license agreement with Actuate in late December 2006, and therefore is presumably fully authorized to use the Actuate Software on BNY's own servers. However, upon further information and belief, BNY does not as yet have the ability to run the Actuate Software on its own servers and therefore remains dependent on JPMC to provide this service during the transition process (as authorized by Section 2(a) of the 1999 Agreement), which will continue for several months.

71.     Thus, Actuate unlawful conduct threatened the essential business activities of two of its licensees. It threatened to place JPMC in breach of its contractual obligations to BNY during the transition period. And if Actuate made good on its threat of

20

termination, it would, upon information and belief, have entirely disrupted BNY's ability to service the needs of its customers in the corporate trust business.

72. JPMC has paid all required license fees and made all required maintenance and support payments relating to the use of Actuate Software in the corporate trust business. Actuate's conduct in the BNY dispute therefore breached its obligations under the Software Licenses.

73. Upon information and belief, it was only when BNY made clear to Actuate that its continued threats were jeopardizing Actuate's new business relationship with BNY and putting BNY at risk that Actuate, upon further information and belief, finally provided BNY with a release of its totally baseless claims concerning the BNY Dispute.

## G. ACTUATE'S OTHER VAGUE AND BASELESS ALLEGATIONS OF BREACH

74. As additional ostensible bases for its threat to terminate JPMC's rights under the Software License, Actuate has (in the December 28 Notice and on other occasions) claimed a "material breach" and an "infringement" based on certain vague, conclusory, and unfounded allegations that JPMC has failed to comply with certain alleged reporting obligations concerning the use of the Actuate Software. See Exhibit A. Actuate has further asserted in the December 28 Notice that JPMC is unable to track the installation of the Actuate Software on its computers because of "the many [JPMC] mergers that have taken place" and the alleged use of a "golden master" key to copy Actuate Software. Actuate's contentions in its December 28 Notice as summarized in this paragraph are collectively referred to herein as the "Miscellaneous Diputes.")

75. In connection with these Miscellaneous Disputes, which constitute no more that Actuate's speculation about the possibilities that some unknown breach could have

occurred, Actuate has not identified any unauthorized copies of the Actuate Software that have been installed or any actual injury that Actuate purports to have incurred.

76.     Such vague and ambiguous conjectures do not support a claim of material breach of the License Agreements and certainly cannot justify the termination of the license or the withdrawal of vital maintenance and support.

77.     Because JPMC has paid or tendered all required license fees known to it and made all required maintenance and support payments relating to the use of Actuate Software, Actuate's conduct in Miscellaneous Disputes (and, in particular, using them as a pretext for terminating the licenses and maintenance) constitutes a material breach of Actuate's obligations under the Software Licenses and imminently threatens tremendous harm to JPMC and its customers and business partners for which JPMC has no adequate remedy at law.

## H.  SUMMARY OF THE FACTS

78.     In summary, the Geneva Dispute, the Investment Banking Dispute, the BNY Dispute, and the Miscellaneous Disputes constitute mere pretexts and ploys for demanding payments from JPMC where no monies are owed.

79.     Actuate has acted in bad faith by, in effect, threatening devastating harm to JPMC's business and to its customers and business partners based upon Actuate's series of baseless claims of breach.

80.     While another vendor could provide substitute software to perform these services, it would, as previously stated, take many months to do so, and it would be impossible to complete this enormous task by January 27, 2007, when Actuate has threatened to cut-off support unless JPMC pays the entire amount demanded.  Even if Actuate were to briefly extend the cut-off date (as it belatedly suggested it would consider doing when it learned that litigation

might be imminent), it would not allow even remotely enough time for JPMC to transition to another software product. JPMC and its customers would be left with no viable alternative for processing the tremendous volume of transactions that are currently handled by means of the Actuate system. The threatened cut-off of services by Actuate would wrongfully expose both JPMC and its customers to the prospect of incalculable losses and liability. The damage to JPMC's reputation and good will would be enormous, and it would jeopardize JPMC's many other business relationships with these important clients.

81. If Actuate were to carry through on its threat to discontinue providing maintenance services, thousands of JPMC's customers in the Private Bank would be denied access to vital information concerning their personal accounts, and those customers would inevitably suffer losses in an amount that cannot be reliably calculated, but which can reasonably be expected to be very substantial.

82. In Section 15.1 of the 1999 Agreement, Actuate expressly promised that "pending resolution of any dispute or controversy," it would "continue [its] performance under this Agreement."

83. Upon information and belief, unless enjoined by this Court, Actuate will unlawfully cut off all services to JPMC.

84. Unless this Court enjoins the unlawful conduct threatened by Actuate and preserves the status quo, JPMC will suffer irreparable harm for which it has no adequate remedy at law.

23

## AS AND FOR FIRST CAUSE OF ACTION

### (Declaratory Judgment)

85.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 84, inclusive, of the Complaint with the same force and effect as if set forth herein at length.

86.     An actual controversy exists between JPMC and Actuate arising out of Actuate's repeated and unjustified demands for excessive payments not authorized by the License Agreements and out of Actuate's notice that it unlawfully intends to cut off maintenance and support for the Actuate Software.   By reason of this actual and justiciable controversy, JPMC is entitled to a declaratory judgment that (a) the License Agreements are in full force and effect; (b) Actuate is required by the License Agreements to continue providing maintenance and support for the Actuate Software; (c) JPMC is not liable to Actuate for any amount on account of the Geneva Dispute, (d) JPMC is not liable to Actuate for any amount on account of the Investment Banking Dispute, (e) JPMC is not liable to Actuate for any amount on account of the BNY Dispute or the Miscellaneous Disputes, and (f) JPMC is required to pay to Actuate only the amount it has previously tender to Actuate on account of the Geneva Dispute.

## AS FOR A SECOND CAUSE OF ACTION

### (Breach of Contract)

87.   JPMC repeats and realleges each and every allegation contained in paragraphs 1 through 86, inclusive, of the Complaint with the same force and effect as if set forth herein at length.

88.   In or about June 30, 1997, The Chase Manhattan Bank ("Chase") entered into the 1997 Agreement with Actuate whereby JPMC received the right to use the Actuate

24

Software "for the useful life of the Software unless sooner terminated." JPMC is the successor in interest to Chase's rights and interests in the 1997 Agreement.

89. In or about September 30, 1999, J.P. Morgan ("Morgan") entered into the 1999 Agreement with Actuate whereby Morgan received an unconditional and irrevocable license to use the Actuate Software. JPMC is the successor in interest to Morgan's rights and interests in the 1999 Agreement.

90. The License Agreements between JPMC and Actuate remain in full force and effect.

91. JPMC has fully performed all of its duties under the License Agreements and has paid – or (in one instance described above) tendered -- all required license fees and all required fees for maintenance and support.

92. Actuate has a duty under Section 7 of the 1997 Agreement and under Section 9 of the 1999 Agreement to provide maintenance and support services relating to the Actuate Software.[1]

93. Actuate has materially breached its duties under the License Agreements by delivering the December 28 Notice wrongfully declaring its intention to terminate the licenses to the Actuate Software and by failing to withdraw the unlawful threat of termination when JPMC demanded in writing that it do so.

---

[1] Section 15(i) of the 1999 Agreement also provides that "[p]ending any resolution or any dispute or controversy, both parties shall continue their performance under this Agreement." That provision also states that JPMC "may make any payments under protest, reserving any rights it may have to seek reimbursement from [Actuate]" (emphasis added), which provision is, by its express terms, permissive, not mandatory. JPMC has repeatedly offered, and Actuate has repeatedly declined to accept, JPMC's offer of the properly calculated license fee and maintenance charge related to the Geneva Dispute.

677555_4

94. Actuate has also materially breached its duties under the License Agreements by threatening in the December 28 Notice to discontinue maintenance and support services for the Actuate Software and by failing to withdraw the unlawful threat of discontinuance when JPMC demanded in writing that it do so.

95. Actuate has also materially breached its duties under the License Agreements, including but not limited to the implied covenant of good faith and fair dealing, by repeatedly demanding license payments that JPMC does not in fact owe (including in one or more instances a totally baseless demand for $12,000,000) and by inventing a series of baseless disputes as the purported basis for its unjustified demands for payment. The pretextual disputes concocted by Actuate include, without limitation, the Geneva Dispute, the Investment Banking Dispute, the BNY Dispute, and the Miscellaneous Disputes.

96. The aforesaid material breaches of the License Agreements are knowing and willful.

97. By reason of the foregoing, unless Actuate's unlawful actions are enjoined by this Court, JPMC will suffer irreparable harm in that at any moment the Actuate Software could develop a functional problem that will cause it to cease to operate or to generate errors that make it useless to JPMC. Because the Actuate Software performs essential reporting operations at the heart of many of JPMC's lines of business, the loss of the Actuate Software would cause immediate, vast, and devastating injury to JPMC, its customers, and its business partners. Some lines of business literally cannot function without the Actuate Software.

98. While it is impossible to predict when it will occur, the shut-down of one or more of JPMC's facilities using the Actuate Software is virtually inevitable, unless Actuate's misconduct is enjoined by this Court.

99. By reason of the foregoing, JPMC has also suffered (and, unless Actuate's unlawful actions are enjoined by this Court will continue to suffer) pecuniary damages in an amount to be proved at trial. If Actuate is not restrained by this Court and succeeds in disrupting JPMC's business by withdrawing essential maintenance and support, the damages sustained by JPMC, its customers, and business partners could accrue suddenly, without any advance warning, and total countless millions of dollars – almost certainly greatly exceeding Actuate's ability to pay.

### AS AND FOR A THIRD CAUSE OF ACTION

(Specific Performance)

100. JPMC repeats and realleges each and every allegation contained in paragraphs 1 through 99, inclusive, of the Complaint with the same force and effect as if set forth herein at length.

101. Under Section 15(i) of the 1999 Agreement, Actuate is required to continue its performance under that agreement pending the resolution of any dispute between the Actuate and JPMC.

102. Actuate has declared in writing that it intends to discontinue the performance of its duties to provide maintenance and support for the Actuate Software. Upon information and belief, Actuate will, in fact, stop providing JPMC with essential maintenance and support unless it is directed by this Court to perform such services during the pendency of the dispute between the parties. By reason of the foregoing, JPMC is entitled to (a) a declaration that Section 15(i) of the 1999 Agreement requires Actuate to continue providing maintenance and support services for the Actuate Software during the pendency of this dispute, and (b) specific performance of that contractual obligation.

677555_4

## **PRAYER FOR RELIEF**

WHEREFORE, JPMC demands judgment as follows:

A.     Declaring that the License Agreements are in full force and effect.

B.     Declaring that Actuate is required by the License Agreements to continue providing maintenance and support for the Actuate Software during the pendency of this action and for the duration of its License Agreements with JPMC.

C.     Declaring that JPMC is not in material breach of the License Agreements;

D.     Declaring that the amount that JPMC has tendered to Actuate (the "JPMC Tender") is the correct and only amount that JPMC owes to Actuate on account of the Geneva Dispute;

E.     Declaring that JPMC is not obligated to pay to Actuate any amount in addition to the JPMC Tender, including, but not limited to, the approximately $800,000 that Actuate has falsely alleged that it is owed in excess of the JPMC Tender on account of the Geneva Dispute, or any additional amounts on account of the other disputes or putative dispute between the parties;

F.     Preliminarily and permanently enjoining Actuate from terminating – or threatening to terminate – the Software Licenses or the maintenance and support services

677555_4

provided to JPMC based upon the so-called "material breaches" and "infringement matters" alleged in the December 28 Notice;

G.   Requiring specific performance by Actuate of its duties under the License Agreements, including, but not limited to, the duty to provide maintenance and support services for the Actuate Software during the pendency of this action and for the duration of its License Agreements with JPMC.

H.   Awarding to JPMC damages on account of any disruption of JPMC's lawful entitlement to use the Actuate Software and to receive maintenance and support services, in an amount to be determined at trial;

I.   Awarding JPMC its reasonable attorneys' fees;

J.   Awarding JPMC its costs in this action; and

K.   Granting JPMC such other and further relief as the Court deems just and equitable.

Dated:   New York, New York
         January 19, 2007

Respectfully submitted,

JPMORGAN CHASE LEGAL
DEPARTMENT

Barbara A. Wald
Assistant General Counsel
JPMorgan Chase
Chase Tower
Chicago, Illinois 60670-0286
312-732-6617

Attorneys of Counsel for Plaintiff
JPMORGAN CHASE BANK, N.A.

SATTERLEE STEPHENS BURKE & BURKE LLP

By: _____
        James J. Coster (JC-1431)
        Joshua M. Rubins (JR-8338)
        230 Park Avenue
        New York, New York 10169
        (212) 818-9200

Attorneys of Record for Plaintiff
JPMORGAN CHASE BANK, N.A.

29

# EXHIBIT A

December 28, 2006

The Chase Manhattan Bank
Contract Management
95 Wall Street—10th Floor
New York, NY 10005
Attn:   Norman W. Willis
        Vice-President
Reference Chase Agreement No. 44252

J.P. Morgan
60 Wall Street
New York, NY 10260
Attention Pierre-Jean Crouy

Barbara A. Wald
Assistant General Counsel
Law Department
JPMorgan Chase
Chase Tower
Mail Code IL1-0286
Chicago, Illinois 60670-0286


Re: JPMC Infringement Matters—Notice of Material Breach and Termination

Dear Ms. Wald:

Unfortunately, after months of effort, Actuate Corporation ("Actuate") has been unable to resolve the many existing JPMorgan Chase ("JPMC") infringement matters. To wit:

1.      Private Bank--Geneva—This matter is still under investigation but it is clear at least 6 and possibly 12 unlicensed CPUs are in use.

2.      Investment Banking, Proprietary Positioning Group--a "cancelled" 10 CPU license key (mbaK4-c3vdy-kdKWd-qrdb) is still being used on an 8 CPU server.

3.      JPMC permitted up to 80 CPUs of Actuate software to be copied and sent to a third party Bank of New York ("BONY") site. Actuate has no license agreement for this software with BONY and JPMC had no authorization to make such transfer.

4.      JPMC informed Actuate it has a practice of using a "golden master" key to copy Actuate software throughout JPMC. Use of such a "golden key" is not authorized under any agreement with JPMC. This practice is particularly troublesome based on the compliance issues we have already found and the amount of unauthorized copying that can take place at an entity the size of JPMC especially where, as here, a careful set of tracking procedures is not in place or is improperly managed.

5.      JPMC has made several statements that due to the many mergers that have taken place they have no idea how much Actuate software JPMC is really using.

6.      JPMC has failed to comply with its reporting responsibilities, which has directly contributed to the issues JPMC now faces. JPMC failed to inform Actuate of any piece of hardware on which Actuate software is installed (June 30, 1997 Agreement between

The Chase Manhattan Bank and Actuate Section 2.03 (Use on Designated Hardware)) or to provide Actuate with a detailed report of user schedules (September 30, 1999 Agreement between J.P. Morgan & Co. Incorporated, Exhibit B, Section 2).

Actuate has spent considerable resources trying to resolve JPMC's breaches without having to resort to more formal measures. Now, our patience is exhausted.

This letter constitutes Actuate's formal notice of material breach under Sections 2.03 (Use on Designated Hardware), 2.04 (No Copies), 3.01 (Title), 3.02 (Proprietary Information), 3.03 (Non-Disclosure), 3.04 (Breach), 3.05 (Injunctive Relief), 11 (NONASSIGNABILITY) and 12 (TERMINATION) of the 1997 Agreement and material breach of the 1999 Agreement.

If JPMC fails to cure these material breaches within thirty (30) days, Actuate will: (i) exercise all of its rights under the 1997 Agreement including but not limited to Section 7 (MAINTENANCE AND SUPPORT) and Section 12 (TERMINATION); (ii) terminate the 1999 Agreement; and (iii) exercise all other rights and seek every other legal remedy available to it.

From this point forward, please send all notices and correspondence to Actuate under the 1997 and the 1999 contracts to:

Actuate Corporation
701 Gateway Boulevard
South San Francisco, CA 94080
Attn: Thomas E. McKeever
General Counsel & Vice President
Corporate Development

cc: Actuate Corporation
701 Gateway Boulevard
South San Francisco, CA 94080
Attn: Daniel Gaudreau
Senior Vice President, Operations and
Chief Financial Officer

I also remind you of the new electronic discovery rules under the Federal Rules of Civil Procedure.

Sincerely,


Thomas E. McKeever
General Counsel &
Vice President Corporate Development

cc: James J. Coster, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York, NY 10169-0079

J.P. Morgan
60 Wall Street
New York, NY 10260
Attention IT Contracts

# EXHIBIT B

SATTERLEE STEPHENS BURKE & BURKE LLP
230 PARK AVENUE
NEW YORK, NY 10169-0079
(212) 818-9200

METROPARK
33 WOOD AVENUE SOUTH
ISELIN, NJ 08830
(732) 603-4966

FAX (212) 818-9606, 9607
www.ssbb.com

E-mail:jcoster@ssbb.com
Direct Dial: (212) 404-8712

January 15, 2007

**BY FACSIMILE (650-827-1560), E-MAIL,
AND FIRST CLASS MAIL**
Actuate Corporation
701 Gateway Boulevard
South San Francisco, California 94080
Attn:
Thomas E. McKeever
General Counsel & Vice President
Corporate Development

Re: **"Notice of Material Breach and Termination"**

Dear Mr. McKeever:

As you know, this firm represents JPMorgan Chase ("JPMC") with respect to disputes with Actuate Corporation ("Actuate"). This letter is written in response to your letter to Barbara A. Wald dated December 28, 2006, headed "JPMC Infringement Matters – Notice of Material Breach and Termination" (herein, the "Termination Letter") and your letter to me dated December 26, 2006, headed "JPMC Infringement Matters" (herein, the "December 26 Letter").

As an initial matter, JPMC is surprised and disappointed that Actuate has chosen to break off discussions between the parties and to threaten termination and the withdrawal of maintenance and support. JPMC has expended substantial time and expense in a good-faith effort to address Actuate's various complaints and demands and was hopeful that these matters could be resolved in a manner consistent with the parties' ongoing business relationship. JPMC remains willing to seek such a resolution, but not while Actuate threatens the illegal and improper termination, two weeks from now, of licenses and support essential to JPMC's business.

Moreover, Actuate's claims of infringement and material breach are uniformly baseless:

1.     The "Private Bank—Geneva" Dispute.    After careful review of all the relevant agreements and documentation it appears clear that there is no contractual basis whatsoever for Actuate's vague and speculative claim that it is "possibly" entitled to additional

compensation for the non-production use of Actuate software on six CPUs solely for emergency restart purposes. With respect to the production use of Actuate software on six CPUs that the parties agree has not been previously licensed, JPMC has previously offered to pay the appropriate 2003 license fee, plus maintenance for a four-year period, minus the amount indisputably remaining as unused "prepaid" under the 1999 Agreement ($220,730).

2.    The Bank of New York ("BONY") Dispute. As previously detailed in my letter to you dated December 21, 2006, any claim related to JPMC's sharing of Actuate material with BONY is negated by the clear documentary record of Actuate's consent to that sharing. In your December 26 Letter, there is, tellingly, no denial that Actuate's counsel, Mr. Earls: (i) received a final email on August 10, 2006, explicitly confirming the scope of Actuate's consent; and (ii) never conveyed to JPMC the slightest disagreement with that confirmation. Moreover, given the fact that these images were shared with BONY for the sole and express purpose of allowing BONY to begin creating an environment in which it can effectively use your products, resulting in substantial new revenues for Actuate, Actuate's claim of "infringement" seems particularly contrived and disingenuous. Indeed, the record will demonstrate that Actuate was enriched, not harmed, by this purported "infringement."

3.    Investment Banking, Proprietary Positioning Group, Dispute.   We have fully investigated this claim and have confirmed that: (i) the license key changes in question were entirely consistent with the applicable agreements and discussions with Actuate; and (ii) the actual use of Actuate by the Group has not expanded in any way and there has been no change in configuration. In short, different license keys were needed simply to allow the Group to use the same Actuate software in the same configuration on different machines that could accommodate the Group's needs with respect to other, non-Actuate applications. Thus, the Group's use of Actuate software has involved no arguable "infringement" and entitles Actuate to no additional fees.

For the foregoing reasons, and those set forth in previous correspondence, JPMC regards the termination of agreements, maintenance and support threatened by Actuate as unlawful and unconscionable. JPMC has paid Actuate substantial sums for perpetual licenses of Actuate software, and -- in reliance upon agreements with Actuate and upon Actuate's obligations, both contractual and non-contractual, to act in good faith -- JPMC has made the use of Actuate software, rather than the software of Actuate's competitors, an essential component of business operations involving many millions of dollars and thousands of clients and business partners. JPMC will hold Actuate responsible for all harm suffered by JPMC, including, but not limited to, harm arising from interference with, and disruption of, JPMC's business relationships with BONY and other third-parties, in connection with the threatened or actual termination of any JPMC/Actuate agreements or licenses or withdrawal or denial of any maintenance or support with respect to Actuate software. JPMC reserves any and all rights and remedies under all agreements with Actuate and under the common law.

679612_1

Thomas E. McKeever
Department of License Administration
Page 3
January 15, 2007

As stated above, JPMC remains willing, as it has always been, to engage in discussions with Actuate with the goal of reaching a fair resolution of any disputes between the parties. Those discussions cannot occur, however, while JPMC is compelled to focus its attention instead on an imminent threat to the operations of the Bank and its ability to fulfill its obligations to its customers and business partners.

Accordingly, JPMC requests that Actuate provide, no later the close of business on January 17, 2007, written notification that the notice of termination has been withdrawn or, failing that, written assurances that, notwithstanding the notice of termination, Actuate will continue to provide its licensed product and all support and maintenance services to which JPMC is, and has been, entitled under the terms of its agreements with Actuate, and will take no action detrimental or disruptive to JPMC's continued use of all Actuate software while the parties seek to resolve their differences.

Very truly yours,

James J. Coster

cc:   Daniel Gaudreau (via first-class mail)
      Joleen Willis (via e-mail)
      Natalie Ruiz (via e-mail)
      Barbara Wald (via e-mail)

679612_1

# EXHIBIT C

Natalie M Ruiz/JPMCHASE
08/10/2006 03:22 PM

To    "Daniel Earls" <dearls@actuate.com>

cc    Joe Berkowitz/JPMCHASE,

bcc

Subject   Fw: your email/vm

Dan. As a follow-up to our conversation, I want to thank you for Actuate's consent to JPMorgan Chase to share images of the JPMorgan Chase servers used primarily for JPMC's Corporate Trust Business which contain copies of Actuate's software, with the Bank of New York to assist the Bank of New York with its planning and implementing the necessary corporate trust computer systems conversions. Your cooperation is greatly appreciated.

As to our discussion on transition rights, please be directed to the Amendment to the End User Software License Agreement dated June 30, 1997 wherein Section 14 - Divestiture permits JPMC the right to support the divested business for a period of 12 months.

Thanks again!
----- Forwarded by Natalie M Ruiz/JPMCHASE on 08/10/2006 03:22 PM -----

Natalie M Ruiz/JPMCHASE
08/10/2006 02:37 PM

To    "Daniel Earls" <dearls@actuate.com>

cc

Subject   Re: your email/vm

Hi Dan. Yes. The sole purpose for the sharing the images of the servers containing Actuate software with BoNY is soley to assist BoNY with its planning and implementing the computer systems conversions for the corporate trust business being sold by JPMC to BoNY. Not to use; not to transfer the license or any rights thereunder. Let me know if you'd like to talk more about this.
"Daniel Earls" <dearls@actuate.com>



"Daniel Earls"
<dearls@actuate.com>
08/10/2006 02:31 PM

To    <natalie.m.ruiz@jpmchase.com>

cc

Subject   your email/vm

Hi Natalie,

I'm not sure if I understand what you're asking.  It sounds like it's a one-time request to let the Bank of NY see one or more existing software server configuration(s) at JPMC and that the software will not be used by the Bank of NY.  Is this correct?

Regards,
Dan

Dan Earls
Corporate Counsel
Actuate Corporation

701 Gateway Boulevard
South San Francisco, CA 94080
Tel. 650-837-2395
Fax 650-827-1560

Strictly Personal and Confidential
*This message may contain confidential and proprietary material for the sole use of the intended recipient. Any review or distribution by others is strictly prohibited. If you are not the intended recipient please contact the sender and delete all copies*

# EXHIBIT D

**Natalie M**
**Ruiz/JPMCHASE**
12/12/2006 09:25 AM

Subject   My Phone Message from Actuate

This message was delivered to my voice mail yesterday, December 11, 2006 at 12:52 pm -- 1.45 in length.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Hey Natalie .... It's Tom McKeevar calling from Actuate

Just wanted you to know that  received an odd voice mail from someone named Joleen Willis apparently from JPMC on Friday, I guess following up on the letter that I had sent to you. It also sounds like you were out Thursday and Friday I don't know whether you've had a chance to see the letter yet, but you know we are reaching a critical point here. You definitely did not have permission to allow or make copies of our software for Bank of New York; it's just not right.

Based on the evidence that I've seen, Dan Earls gave you specific permission regarding specifications; you tried to broaden that with an email that he never responded to, you should have clarified that with him and gotten a definitive response. Short of that you should not have copied the software. This looks like it's about a 12 million dollar issue if you did make copies of all of our software and given it to Bank of New York including maintenance.

You know there are ways to work around this I think, but I'm gonna need your help to do that. We all know that Bank of New York needs to buy something at some point. I think they'd prefer to wait till next September; we want them to buy it now. If you help us get them to buy the software now, we might be able to overlook this transgression, but if we don't get help from you, and in fact if you push back the other way, it's going to be a totally different issue. I mean 12 million dollars is certainly worth going after from a full legal point of view and a financial and commercial point of view.

So call me back when you get a chance. My number is 650-837-4920.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*